UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Blaine/Atlantic Funding, LLC, | Case No. 23-CV-00172 (JMB/DLM) |
| Plaintiff, | |
| v. | **ORDER** |
| City of Blaine, | |
| Defendant. | |

Bryan J. Huntington, Katherine Cochran, and Kyle Vick, Larkin Hoffman Daly & Lindgren, Ltd., Minneapolis, MN, for Plaintiff Blaine/Atlantic Funding, LLC.

Justin L. Templin, Hoff Barry, PA, Eden Prairie, MN, for Defendant City of Blaine.

This matter is before the Court on Plaintiff Blaine/Atlantic Funding, LLC's (B/A) and the City of Blaine's (City) cross-motions for summary judgment. (Doc. Nos. 58, 61) In their motions, B/A and the City each seek summary judgment in their favor on B/A's claim that the City's denial of certain land-use applications, which would have re-zoned property owned by B/A and allowed B/A to build an apartment building, violated the Equal Protection Clause. For the reasons explained below, the Court denies both motions.

## BACKGROUND

### A.  Municipal Land Use Planning

Blaine is a suburban city located in Anoka County, Minnesota, and is situated approximately twelve miles north of downtown Minneapolis. The Minnesota Legislature has acknowledged that cities within the seven-county Twin Cities metro area, which

1

includes Anoka County, "are interdependent" and, as a result, their development and land use may impact other cities in the region. Minn. Stat. § 473.851. Consequently, metro-area cities, including Blaine, are required to create and update a forward-looking "comprehensive plan" each decade. *See* Minn. Stat. § 473.859. Among many other things, comprehensive plans are meant to identify certain areas of the city for potential redevelopment and set forth a vision for future land use. (*See* Doc. No. 66-3 at 3, 5.)

After a city council adopts a comprehensive plan, the Metropolitan Council (Met Council) reviews it and any subsequent amendments to it "to determine their compatibility with each other and conformity with metropolitan system plans." Minn. Stat. § 473.175, subd. 1. The Met Council may require a city to modify parts of a comprehensive plan or any proposed amendments if it determines that the plan or amendment "is more likely than not to have a substantial impact on or contain a substantial departure from the metropolitan system plans." *Id.* A city may not implement any part of a comprehensive plan that has not been approved by the Met Council. *Id.*, subd. 2.

In December 2020, the Blaine City Council adopted the 2040 Comprehensive Plan (2040 Plan). The 2040 Plan "establish[es] a vision for how the community will grow and develop over the coming decades and is intended to be reflective of the desires of the entire community," and is meant "to inform decision making related to official controls, such as the zoning ordinance." *Blaine 2040 Comprehensive Plan*, City of Blaine, [hereinafter, "2040 Plan"] at 1, https://blainemn.gov/558/Comprehensive-Plan [ https://perma.cc/4ZLS-

PV78 ].[1]  As the 2040 Plan notes, "[a] comprehensive plan does not ensure any change by itself" and advises that changes to things like land use must be implemented by "elected officials, commission members, city staff, and other stakeholders."  (2040 Plan at 1.)  The 2040 Plan also identifies itself as a "living document" that is subject to revisions.  (*Id.*)

B.   **Northtown Area Revitalization and Redevelopment Plan**

At issue is in this case is a 6.2-acre parcel in Blaine's "Northtown" area on which a strip mall and a former Rainbow Foods grocery store—vacant since 2014—sits (the Property).  (Doc. No. 66-1 at 17:6–13.)  At all relevant times, the Property is and has been zoned for commercial use.  (Doc. No. 66-3 at 5.)  The Property is surrounded by neighborhoods of single-family homes to the north and east, and by commercial properties, including an enclosed shopping mall and County Highway 10 to the south and west.  (*Id.*) The 2040 Plan does not identify the Property as a priority area for redevelopment,[2] and its land-use plan designates the Property for "community commercial" zoning.  (*See id.* at 3, 5.)

---

[1] At times, the Court necessarily refers to portions of the 2040 Plan that were not provided by the parties in their moving papers.  Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the entire 2040 Plan.  Fed. R. Evid. 201(b)(2) (noting that a court may, sua sponte and at any time, take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").  The 2040 Plan was adopted by the City Council and is posted and publicly available via the City's website.

[2] The 2040 Plan does, however, identify an area to the immediate northwest of the Property for "high-priority" development.  (*See* Doc. No. 66-3 at 3.)

3

B/A purchased the Property in December 2020. (Doc. No. 66-9 at 6.) After unsuccessful attempts to attract commercial tenants to the empty Rainbow Foods box building (Rainbow Box), B/A began to consider multi-family residential development of the Property. (*See id.* at 7.) A representative of B/A attended City Council workshop meetings to discuss the transition of the Property from commercial to high-density residential use, which would require City Council support for an amendment to the 2040 Plan to re-zone the Property. (*See* Doc. No. 25-6 at 2–5; *see also* Doc. No. 66-9 at 7.) City Council Workshop minutes from June 2021 reflect that "[t]he council supported the rezoning of this property to HDR-2 [high-density residential]." (Doc. No. 25-6 at 4.)

From July 2021 to July 2022, B/A and multi-family developer Roers Companies (Roers) collaborated with the City Planning Commission to develop the Northtown District Vision Plan (Northtown Plan), which set forth a framework for the redevelopment of the business and residential districts around (and including) the Property. (*See* Doc. No. 66-7.) According to Blaine Community Development Director Erik Thorvig, the "intent of the Northtown Vision Plan was to engage stakeholders and our City Council in identifying what that long-term vision is for the Northtown area," and to "capture a vision and set out implementation steps on how a portion of that vision or that vision in its entirety could be carried out." (Doc. No. 66-1 at 12:25–13:3, 13:10–13.) According to City Planner Sheila Sellman, the Northtown Plan was to serve as a "guiding document—it's guidelines, it's not part of our comprehensive plan" and it was not intended to make the comprehensive plan more concrete or specific. (Doc. No. 66-4 at 7:20–25; *see also id.* 12:5–6.)

4

On July 6, 2022, the City Council voted on a resolution entitled, "Approval of the Northtown Area Revitalization and Redevelopment Plan." (Doc. No. 25-5 at 5.) During discussion on the resolution, the Northtown Plan's proponents noted that several peer cities "have completed future plans around these commercial nodes to address the changing retail climate." (*Id.*) The meeting minutes reflect that "[t]he plan introduces a mix of commercial, residential, and civic uses," but never squarely discusses details about new multi-family developments. (*Id.* at 5–7.) Thorvig also noted that "[t]he plan is a framework for future development, and it is anticipated that the full build-out will look different from what is shown within the plan." (*Id.* at 6.) After discussion, including acknowledgment by councilmembers that "this was not a concrete plan," and that the "project was not finalized but the plan would assist in guiding the Council going forward," the City Council unanimously adopted the resolution. (*Id.* at 7.)

### C.     Denial of Applications to Re-Zone the Property

While the Northtown Plan was being developed, B/A and Roers worked together to design a four-story 196-unit, market-rate, and amenity-rich multi-family apartment complex known as the "Blaine Lakes Apartments" (the Project) to be built in place of the Rainbow Box. (Doc. No. 66-6 at 3; Doc. No. 66-9 at 6.) A traffic-engineering firm reported that the daily trips estimated at the Project would "generate far fewer trips than what would be allowable under current zoning." (Doc. No. 66-8 at 2.)

On October 7, 2022, several applications related to the Project were submitted on B/A's behalf for the City Council's consideration (together, the Applications), including applications for the following four changes: (1) a Comprehensive Plan Amendment

regarding the proposed change of zoning from commercial to high-density residential; (2) re-zoning of the Property from Community Commercial to High-Density Residential; (3) a conditional use permit allowing for a 196-unit apartment in a development flex zoning district; and (4) a change in the plan, creating two lots, including one on which the apartment building would be constructed. (Doc. No. 66-9 at 6.)

On November 9, 2022, the City Planning Commission held a public hearing on the Applications. (*Id.* at 7–10.) Members of the public expressed their concerns about the Project, including perceived negative impacts on traffic, air quality, neighborhood aesthetics, and crime. (*Id.* at 7–9; *see also* Video Recording of November 9, 2022 Blaine City Council Meeting, https://blainemn.portal.civicclerk.com/event/285/media.) Ultimately, the Commission voted in favor of the Applications, sending the Applications to the full City Council for a vote. (Doc. No. 66-9 at 12; Doc. No. 25-1 at 2–11.)

On December 5, 2022, the City Council considered the Applications. (Doc. No. 25-9 at 14–17.) It voted first on the application to amend the 2040 Plan to re-zone the Property from commercial to high-density residential. (*Id.* at 14–16.) The proposed amendment required five councilmembers' votes to pass. *See* Minn. Stat. § 462.355, subd. 3. It received only four votes, and it did not pass. (*Id.* at 16.) As a result, the City Council denied the remaining Applications. (*Id.* at 16–17.)

In its written statement of denial, the City Council stated as follows:

> The Council denied the amendment request because the Council:

6

  a.  Found the construction of a 196-unit apartment building in this location is not consistent with the surrounding land uses; and

  b.  Found that the size and the scope of the proposed apartment was too large for the selected site and surrounding area; and,

  c.  Would have a negative impact on the surrounding neighboring properties; and,

  d.  Would increase traffic in the area without any proposed mitigation measures being taken as part of the proposed development project.

(Doc. No. 66-10 at 3.)

On April 23, 2023, approximately four months later (and three months after this litigation commenced), B/A and Roers executed a "Letter of Intent" (Letter). (*See* Doc. No. 67 (SEALED).) In it, B/A and Roers acknowledge that they "had been dealing on a verbal agreement for the purchase and sale of the Property" but had not yet formalized a written contract due to certain "unknowns" (e.g., shape of the building, number of units) about the Project. (*Id.* at 3.) However, they agreed that,

> now that the Project has not been approved by a single vote, and legal action commenced, the parties have deemed it advisable to memorialize their prior verbal understanding with this Letter of Intent. This Letter of Intent is intended to outline the terms and conditions for the purchase of this property by Buyer from Seller.

7

(*Id.*)  The Letter goes on to state that Roers and B/A contemplated that Roers would purchase the Rainbow Box for a purchase price that was at least $1 million more than then-current market-rate prices.[3]  (Doc. No. 66-2 at 5:1–5, 8:7–10.)

However, because the City did not approve the Applications, the sale contemplated by the Letter never occurred.  On November 20, 2023, approximately eleven months after the City Council denied the Applications, B/A sold the entire Property (including both the Rainbow Box and adjacent strip mall) to a third-party buyer for $7,575,000.  (Doc. No. 66-17 at 3.)  Approximately five weeks later, that buyer sold just the Rainbow Box to a second third-party buyer for just shy of $950,000 less than the purchase price in the Letter. (Doc. No. 66-20 at 3.)

### D. This Action

In January 2023, B/A filed this lawsuit.  In its Second Amended Complaint, B/A alleges that the City violated its rights as a class-of-one to equal treatment under the Equal Protection Clause and by denying the Applications without a rational basis.  Specifically, B/A argues that it was subject to disparate treatment by the City because, in the several years preceding B/A's and Roers's conception of the Project, the City Council has considered and approved land-use applications that allowed four other multi-family projects to be built, as follows:

1. Cedar Green Apartments: a 138-unit market-rate, five-story apartment project for which the City Council approved an amendment to the 2030 Comprehensive Plan to re-zone the property from medium-density

---

[3] In the Letter, B/A and Roers also expressly acknowledge—twice, and in all-caps—that the Letter was non-binding. (Doc. No. 67 at 5.)

    residential to high-density residential in 2018. The property had been guided for high-density residential in the then-draft 2040 Plan.

2. Lexi Apartments: a 182-unit market-rate, four-story apartment project for which the City Council approved an amendment to the 2040 Plan to re-zone the property from planned industrial/planned commercial to high-density residential in 2021.

3. Arris II: a 64-unit market-rate, four-story apartment project for which the City Council approved an amendment to the 2040 Plan to re-zone the property from planned industrial/planned commercial to high-density residential in 2021.

4. Blaine Apartments: a 111-unit market-rate, three-story apartment project for which the City Council approved an application to re-zone the property from low- and medium-density residential to high-density residential in 2022.

In B/A's view, these apartment projects were sufficiently similar to the Project such that the City's approval of the applications that allowed these projects to be built—and the denial of the applications to accommodate their Project—were without rational basis and, therefore, unconstitutional.

## DISCUSSION

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "material" if its resolution affects the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive the motion, the non-moving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). As is normally the case in a summary judgment motion, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. However, when faced with cross-

9

motions, as here, the Court views the record in the light most favorable to the City when considering its motion, and in the light most favorable to B/A when considering its motion. *See, e.g.*, *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012).

## I. THE CITY'S MOTION FOR SUMMARY JUDGMENT

The City moves for summary judgment on B/A's class-of-one claim. The Court denies the motion because the City has not "inform[ed] the district court of the basis for its motion," or otherwise "identif[ied] those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Mensie v. City of Little Rock*, 917 F.3d 685, 688 (8th Cir. 2019) (quotation omitted); *see also* Fed. R. Civ. P. 56(c).

The City bases its motion on only two sources: the factual representations contained in the Second Amended Complaint and the exhibits appended to attorney Justin Templin's declaration (Doc. No. 64) (Templin Declaration). Neither source sets forth facts, much less facts from "portions of the record [the City] believes demonstrate the absence of a genuine issue of material fact" for the following reasons. *See Mensie*, 917 F.3d at 688. The factual allegations contained in the unsworn Second Amended Complaint are not facts or record evidence. More substantively, the Templin Declaration (Doc. No. 64) contains statements of fact but no explanation of how Templin came to know these facts or an explanation of how Templin is competent to testify as to these facts. *See* Fed. R. Civ. P. 56(c)(4) (requiring that a declaration submitted in support of a motion for summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"); *see also Narum v. Eli Lilly & Co.*, 914 F. Supp. 317, 321 (D. Minn. 1996)

10

(excluding paralegal's affidavit that lacked foundation and details regarding basis of personal knowledge from summary judgment record). For example, Templin makes certain representations about City Council action, including whether the Northtown Plan was submitted to the Met Council. (Doc. No. 64 ¶ 3.) Templin, however, provides neither citation to a record document to support this representation nor any details regarding how he came to know this information. Further, there is no representation that the exhibits attached to the Templin Declaration have been produced as part of the discovery in this litigation and they do not bear any Bates stamps to suggest as much. (*See* Doc. No. 64-1.) As a result, the Templin Declaration lacks foundation and cannot be relied on by the Court.

Apart from the Second Amended Complaint and the Templin Declaration, the City has not brought any evidence or identified any facts that could support judgment in the City's favor. For that reason, the City's motion for summary judgment is denied.

## II.  B/A'S MOTION FOR SUMMARY JUDGMENT

B/A seeks judgment in its favor on its class-of-one claim. Because the evidence presented contains a genuine dispute as to whether the City intentionally treated B/A differently from others similarly situated, the Court denies B/A's motion.

The Equal Protection Clause requires the government to "treat all similarly situated people alike." *Mensie*, 917 F.3d at 691 (quotation omitted). The U.S. Supreme Court recognizes a claim by a "class-of-one" under the Equal Protection Clause, including in zoning and land-use cases. *See Barstad v. Murray Cnty.*, 420 F.3d 880, 884 (8th Cir. 2005). A class-of-one claim is meant to "secure every person within the State's jurisdiction against intentional and arbitrary discrimination." *Village of Willowbrook v. Olech*, 528 U.S. 562,

11

564 (2000). To prevail on a class-of-one claim, B/A must satisfy a two-part test, showing the following: (1) "[it] has been intentionally treated differently from others similarly situated;" and (2) "there is no rational basis for the difference in treatment." *Id.* In a class-of-one analysis involving a zoning decision, the Court may not act as a "super zoning board" by "review[ing] the evidence and revers[ing] the commission merely because a contrary result may be permissible." *Mensie*, 917 F.3d at 692 (quotation omitted).

To establish the first prong of its class-of-one claim, B/A bears the burden of identifying "a specific and detailed account of the nature of the preferred treatment of the favored class, especially when the state actors exercise broad discretion to balance a number of legitimate concerns." *Mensie*, 917 F.3d at 692 (quotation omitted). The persons or entities to which B/A compares itself "must be identical or directly comparable" to B/A "in all material respects." *Sanimax USA, LLC v. City of S. St. Paul*, 95 F.4th 551, 564 (8th Cir. 2024). It is a "demanding standard," *Mensie*, 917 F.3d at 692, which is more difficult for a plaintiff to establish when the challenged government action involves "complex, multi-factored government decisionmaking processes." *Sanimax*, 95 F.4th at 565 (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1203 (11th Cir. 2007)). Normally, but not always, "the ultimate determination as to whether parties are similarly situated is a fact-bound inquiry and, as such, is normally grist for the jury's mill." *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007). However, when the undisputed factual record shows that a party is not similarly situated in all material respects, then a class-of-one claim may not survive summary judgment. *See Sanimax*, 95 F.4th at 568; *Cordi-Allen*, 494 F.3d at 251; *Solum v. Bd. of Cnty. Comm'rs for Cnty. of Houston*, 880 F. Supp. 2d 1008, 1014–15

(D. Minn. 2012).  At the same time, small differences between comparators will not doom a class-of-one claim.  *See Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n of Webster Cnty., W.V.*, 488 U.S. 336, 340 (1989).

Courts look to two attributes to determine whether comparators are similarly situated as a matter of law.  First, courts consider whether there is regulatory similarity—i.e., whether the purported comparator asked the same body to take the same action.  *See Barstad*, 420 F.3d at 885 (concluding plaintiff, who was made to obtain variance, failed to identify similarly situated landowner who had not been required to obtain same variance and thus could not satisfy similarly-situated prong of Equal Protection analysis); *Anderson v. Douglas Cnty.*, 4 F.3d 574, 577 (8th Cir. 1993) ("A party claiming violation of equal protection must establish that he or she is 'similarly situated' to other applicants for the license, permit, or other benefit being sought."); *Solum*, 880 F. Supp. 2d at 1014 (concluding plaintiff, who sought and was denied variance application, was not similarly situated to landowners that sought conditional-use permits); *see also Cordi-Allen*, 494 F.3d at 251–52 (concluding that plaintiffs must "establish factual as well as regulatory similarity" by "engag[ing] in the same activity vis-à-vis the government entity"); *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002) (concluding that seeking different kinds of variances makes properties dissimilar).

Second, courts also consider whether there is factual similarity—i.e., whether comparators share attributes that a reasonable decisionmaker would have found relevant when making the challenged decision.  *See Sanimax*, 95 F.4th at 565 (holding that, when seeking to identify similarly situated comparators, Court must identify "full variety of

13

factors that an objectively reasonable government decisionmaker would have found relevant in making the challenged decision"). A reasonable government decisionmaker would consider how a proposed development would impact surrounding areas as well as public opinion regarding a proposed development. *Id.* at 564–65.

In this case, B/A argues that the record establishes both regulatory and factual similarity between the Project and all four identified comparators: Cedar Green Apartments, Blaine Apartments, Lexi Apartments, and Arris II. The City disputes B/A's view of the record evidence, arguing that the Project has neither regulatory nor factual similarity with any of the four comparators. The Court agrees with the City concerning Cedar Green Apartments, Blaine Apartments, and Lexi Apartments, but the Court concludes that a genuine fact dispute remains regarding whether the Project is similarly situated to Arris II.

The Court first concludes that there is no regulatory similarity between the Project and either Cedar Green Apartments or Blaine Apartments. Unlike the Project, neither Cedar Green Apartments nor Blaine Apartments required an amendment to the 2040 Plan because the 2040 Plan already guided the sites of these properties for high-density residential use.[4] (Doc. No. 66-4 at 5:15–18; Doc. No. 66-13 at 9–14; 2040 Plan at 144.) In this way, the City Council's decision to re-zone the properties to conform with the 2040

---

[4] Cedar Green required the City Council to approve an Amendment to the 2030 Plan to re-zone the property to high-density residential. However, the City Council had already slated the property for high-density residential use in the then-draft 2040 Plan and, for that reason, approved the proposed amendment. (Doc. No. 66-13 at 11–12.)

14

Plan was simply a fulfillment of a predetermined and pre-approved end. Under *Barstad*, *Anderson*, and *Solum*, Cedar Green and Blaine Apartments are not, as a matter of law, similarly situated comparators.

The remaining two comparators, Lexi Apartments and Arris II have regulatory similarity to the Project: both required amendments to the 2040 Plan. However, Lexi Apartments is factually dissimilar to the Project because it is not located near a low-density residential neighborhood, and it received no opposition from neighboring landowners. (Doc. No. 66-14 at 10–11.) Under *Sanimax*, a reasonable government decisionmaker would find public input relevant to its decision; as a result, Lexi Apartments may not, as a matter of law, be deemed a similarly situated comparator to the Project.

Whether Arris II and the Project are sufficiently factually similar is a genuine dispute of material fact for trial. *Cordi-Allen*, 494 F.3d at 251; *see also Ziss Bros. Const. Co. v. City of Independence, Ohio*, No. 1:07-CV-3767, 2010 WL 11538705 at *13 (N.D. Ohio Mar. 30, 2010) (denying city's motion for summary judgment on class-of-one claim on grounds that "there are facts from which a jury could conclude that the properties are similarly situated" and also that "there is evidence that they are not similarly situated"). On one hand, the evidence presented includes evidence that Arris II and the Project have some important similarities: both properties are adjacent to arterial roads or highways, and neither Arris II nor the Project were designated as a priority-redevelopment areas in the 2040 Plan. (*See* 2040 Plan at 143.) In addition, the parties agree that both projects have similar scope: Arris II is a sixty-four-unit, four-story structure that comprises 32 dwellings

per acre (Doc. No. 25-4 at 7), and the Project would have been a 196-unit, four-story structure that comprised 31.61 dwellings per acre (Doc. No. 66-9 at 6; Doc. No. 79 ¶ 8).

On the other hand, however, the evidence presented also included dissimilarities between the Project and Arris II, including the fact that the 2040 Plan designated the area surrounding Arris II as "Planned Industrial/Commercial" use while the area surrounding the Project was designated only for "Commercial" use in the 2040 Plan. (2040 Plan at 143.) In addition, the land uses for the neighboring properties of Arris II included high-density residential use as well as single-family residential and commercial uses. (Doc. No. 25-3 at 8.) In contrast, the Project had no neighboring high-density use properties and instead the Project's neighboring properties were primarily single-family homes (designated for low density residential use) and commercial properties (designated for commercial use). (Doc. No. 66-3 at 5.) Finally, although the public raised concerns that both Arris II and the Project would exceed zoning requirements and increase traffic (Doc. No. 66-15 at 11; Doc. No. 66-19 at 18), the public raised a concern about increased criminal activity only with respect to the Project, not Arris II. (Doc. No. 66-9 at 7). Given this evidence, there remains a genuine issue of material fact concerning whether the Projects is sufficiently similar to Arris II, precluding summary judgment.[5]

---

[5] In light of this decision, the Court need not address whether the evidence presented also contains a genuine fact dispute concerning the second prong of B/A's class-of-one claim (whether the City had a rational basis for any differential treatment).

**ORDER**

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1. Defendant City of Blaine's motion for summary judgment (Doc. No. 61) is denied; and

2. Plaintiff Blaine/Atlantic Funding, LLC's motion for summary judgment (Doc. No. 58) is denied.

Dated:  October 18, 2024

/s/ *Jeffrey M. Bryan*
Judge Jeffrey M. Bryan
United States District Court